UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| JI EUN LEE,<br>Plaintiff,<br>v.<br><br>IAN MALLORY,<br>Defendant. | No. 25-CV-122<br><br>COMPLAINT<br><br>JURY TRIAL DEMANDED |

## Introduction

University campuses should be a place where the value of free speech is upheld. However, at the University of Iowa speech is tolerated only when it does not offend others. A former U of I resident physician was frustrated by the behavior of her former colleagues and leadership failures that permitted that behavior to go unpunished. She took to social media to share her frustrations. Rather than engage in self-reflection, or respond with speech of their own, the subjects of the criticism turned to their in-house police department.

The University of Iowa's police department was all too happy to help. Under department policy, a detective served the former resident with a "harassment warning"—a promise to arrest her if she said anything about her former colleagues again. When she did, a police detective made good on the threat and filed a criminal charge. As he later explained in court, once he gives a harassment warning to

somebody, if they say anything, threat or not, they are subject to being charged with a crime.

But as the United States Supreme Court has explained repeatedly, a person cannot be criminally charged simply for saying things that others do not like. It does not matter if the speech is offensive or outrageous, tolerating speech one does not like is part of being an American. The First Amendment does not tolerate the police filing criminal charges simply because they have not obeyed their order to be quiet. Because none of the speech involved was a "true threat," the constitution does not permit the government to punish it with criminal charges. The flagrantly unconstitutional behavior of the defendant results in this action being brought before the Court.

## Parties, Jurisdiction, and Venue

1. Ji Eun Lee is a resident of the State of California.

2. Ian Mallory is a detective with the University of Iowa Police Department. He is sued in both his official and individual capacities.

3. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. § 1983.

**4.** Venue in this Court is appropriate under 28 U.S.C. § 1391 because the conduct giving rise to this action occurred in this judicial district and the defendant lives and has his principal place of business in this judicial district.

**Factual Background**

5. Lee is a medical doctor. She graduated from Tufts University School of Medicine in 2017, receiving her M.D. degree. She then began an internship and residency at the University of Iowa Hospitals and Clinics in family medicine.

6. While at UIHC, Lee became increasingly concerned by the behavior of some of her colleagues. In particular, she believed that other residents and supervisor physicians of the family medicine department engaged in and tolerated disability discrimination and racism against minority resident physicians.

7. A later lawsuit against UIHC employees bore out Lee's concerns, with the state paying $495,000 in 2021 to settle claims in a case involving discrimination.

8. Lee left the UIHC residency program in 2019. She joined a family medicine residency program at Michigan State University which she successfully completed in 2021. She then successfully completed a fellowship program in geriatric medicine at the University of California – Irvine Medical Center. She is currently employed at a hospital in the greater Los Angeles, California area and is licensed to practice medicine in the State of California.

9. Because of Lee's view that UIHC residents and staff had engaged in misconduct, she took to social media to express her concerns.

10. Lee used Facebook and X to communicate her disagreement with UIHC residents and staff. Her comments, while direct and disparaging, did not threaten violence.

11. On or about December 19, 2022, Mallory received a report that Lee had made "online threats" to UIHC employees. Mallory's summary report of his

investigation states that "Dr. Lee's writings were largely within the bounds of free speach (sic) but occasionally there were references to 'I'll get you and your family' directed towards some employees."

12. Mallory's police report does not substantiate that Lee made references to "I'll get you and your family" in her social media posts. This phrase does not appear in any discovery materials later produced by the State of Iowa in the prosecution of Lee.

13. None of the social media messages in Mallory's possession on December 19, 2022, constituted a true threat to do violence by Lee. Mallory was aware from the beginning of his investigation that Lee lived in the Los Angeles, California area while she was making the social media posts.

14. On December 23, 2022, Mallory participated in a video conference call with UIHC staff about Lee. Mallory discussed with the group various criminal justice system options, including pursuing harassment charges.

15. Following the call, two individuals asked Mallory to pursue one of the options he had offered on the call: sending Lee a "harassment warning."

16. Under the policies of the University of Iowa Police Department, a "harassment warning" is a document directed to the subject of an investigation that the individual is not to communicate with the complainant.

17. Mallory was unable to reach Lee by telephone in December 2022 and January 2023. He was able to leave a voicemail for Lee on January 11, 2023. Mallory sent Lee a harassment warning on January 14, 2023, by certified mail.

18. Mallory learned that the harassment letter could not be delivered by the US Postal Service. On February 9, 2023, he closed his case as inactive because Lee had stopped posting on social media about UIHC employees.

19. In October 2023 Lee decided to begin posting on social media about her dissatisfaction with various current and former UIHC employees. When Mallory learned of this, he called Lee and was able to speak with her on October 16, 2023.

20. During the October 16, 2023, conversation, Mallory informed Lee of the departmental harassment warning, emailed her a copy of the document, and told her that if she communicated with her former colleagues by posting comments about them on Twitter she would be criminally charged with harassment. A copy of Mallory's letter and the enclosed departmental harassment warning is attached as Exhibit A to this complaint.

21. Lee continued to post about her former colleagues at UIHC to express her criticism of them. In these post-October 16, 2023, Facebook and Twitter posts, she would use a "hashtag" functionality that easily permits users to search for terms in a social media post. Some of the hashtags included in her posts were of the former UIHC colleagues she was critical of. Lee did not, however, use a "tagging" functionality that would alert a user that he or she had been tagged in a post. Thus, the only way Lee's former colleagues would be aware of Lee's posts would be if someone sought them out.

22. Facebook and Twitter have a blocking functionality that permits a user from seeing another user's posts in their feed.

23. Mallory's police report documents that on November 9, 2023, he "was made aware LEE was again posting on Twitter and tagging the multiple victims from UIHC, in direct violation of the harassment warning she had been issued. She also posts and tags directly to the University of Iowa Police Department than the Harassment Warning 'I am not in the least bit threatened by this.'"

24. On November 9, 2023, Mallory filed a criminal complaint with the Johnson County Clerk of Court charging Lee with Harassment in the Third Degree, in violation of Iowa Code § 708.7(4). The criminal complaint stated the Lee's offense conduct was to "harass ______ by communicating by telephone, telegraph or writing without legitimate purpose and in a manner likely to cause the other person annoyance or harm." As indicated, the statement of offense conduct did not identify a specific victim of the offense.

25. The statement of facts in support of the complaint was also terse: "After being issued a harassment warning on 10/16/2023 via email and phone, and acknowledging receipt of the warning by posting it on the defendant's Twitter account, the defendant continued to post about multiple victims/complainants on her twitter page and also stated, "I'm not the least bit threaten by this" referencing the harassment warning."

26. Mallory's criminal complaint did not track with the language of Iowa Code § 708.7. Harassment is defined by that statute as follows:

> 708.7(1)(a) A person commits harassment when, with intent to intimidate, annoy, or alarm another person, the person does any of the following:

> (1) Communicates with another by telephone, telegraph, writing, or via electronic communication without legitimate purpose and in a manner likely to cause the other person annoyance or harm.

27. The statute permits a harassment charge when a person communicates *with another*, but not when a person merely communicates *about another*. Mallory's investigation, explanation of the harassment warning, and his criminal complaint ignore this distinction. Mallory's statement of facts in support of probable cause alleges only that Lee "continued to post *about* multiple victims/complainants on her twitter page" (emphasis added).

28. Mallory's police report identified five tweets by Lee that formed the basis of the harassment charge. Those tweets are reproduced in Exhibit B to this complaint.

29. Contrary to Mallory's statement in his police report, none of the tweets he identified as the basis for the November 9, 2023, harassment charge "tagged" any of the complaining individuals at UIHC.

30. Mallory's criminal complaint did not allege that any statement of Lee was a true threat against any victim. The complaint based the criminal charge simply on Lee's posts about specific individuals.

31. After Mallory filed his criminal complaint, a warrant was issued for Lee's arrest.

32. Lee did not learn there was a warrant for her arrest until July 2024. She retained an attorney to represent her in the criminal proceeding.

33. On January 30, 2025, Lee's attorney moved to dismiss the harassment charge because it violated the First Amendment to prosecute an individual for simply posting about another, even if law enforcement had served a "harassment warning."

34. Lee's motion explained that under United States Supreme Court precedent, "[f]rom 1791 to the present," the First Amendment has "permitted restrictions upon the content of speech in a few limited areas." *Counterman* v. *Colorado*, 600 U.S. 66, 73 (2023). These limited exceptions are familiar, such as "incitement—statements directed at producing imminent lawless action...defamation—false statements of fact harming another's reputation...[and] obscenity—valueless material appealing to the prurient interest and describing sexual content in a patently offensive way." *Id.* at 73-74 (cleaned up). "'True threats' of violence is another historically unprotected category of communications." *Id.* at 74.

35. A "true threat" is a "statement that a reasonable recipient would have interpreted as a serious expression of an intent to harm or cause injury to another." *Doe* v. *Pulaski Co. Special Sch. Dist.*, 306 F.3d 616, 624 (8th Cir. 2002) (en banc). "The recipient's reaction still must be a reasonable one even if he or she suffers some unique sensitivity..." *Id.* at 623. Whether a reasonable person would believe a statement was a true threat is a question of law. *Id.* at 626.

36. Because Lee had criticized the conduct of governmental employees in her social media posts, her motion explained that those who exercise governmental power are expected to "shoulder a degree of criticism about their public service from their constituents and their peers—and to continue exercising their free speech

rights when the criticism comes." *Houston Comm. Coll. Sys.* v. *Wilson*, 142 S.Ct. 1253, 1261 (2022). "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that it was adopted in part to protect the free discussion of governmental affairs." *Id.* (cleaned up).

37. Lee's motion to dismiss was heard in the Iowa District Court for Johnson County on March 14, 2025. Mallory testified at the hearing. In his testimony, he confirmed that the criminal charge against Lee was filed because Lee had disobeyed the "harassment warning" that Mallory had issued her. After Lee's counsel confirmed with Mallory that the five tweets shown in Exhibit B were the basis of the criminal complaint, Mallory explained his rationale for the criminal charge:

> A. What I'm showing in those two Tweets on Page 6 of your brief is that the Defendant communicated with the victims in the case after she was explicitly told not to.
>
> Q. In your mind, that -- do I understand it, then, it doesn't matter if the communication is not threatening; that if you told her to stop, she has to stop.
>
> * * *
>
> A. I believe our harassment warning has the language on it that says, You are not to communicate with this person. You are violating the Iowa Code for harassment.
>
> * * *
>
> Q. And so, in your mind, once you give that warning to somebody, if they say anything, threat or not, they're subject to being charged with a crime. Is that fair?
>
> A. I believe that's the intent and the spirit of the harassment warning.

38. Lee's motion to dismiss was heard by District Associate Judge Brandon Schrock. Judge Schrock granted the motion in an order dated May 30, 2025.

39. Judge Schrock ruled that Mallory's criminal complaint "simply fails to allege conduct that would satisfy the elements of harassment as contained within the language of Iowa Code Section 708.7(1)(a) or (b)." Judge Schrock found the "complaint fails to state any facts which could be construed as intended to threaten, intimidate or alarm any of the prospective victims in this matter."

40. Judge Schrock noted that the "criminal complaint merely focuses on the harassment warning issued to the Defendant and the republication of that warning. The issuance of such a warning carries no real legal significance aside from placing a prospective defendant on notice their actions may be a violation of the law and may be used to establish the mens rea requirement for any subsequent communications."

41. Judge Schrock summarized his findings by stating, "[t]he criminal complaint, on its face, simply fails to allege any criminal act on the part of the Defendant."

42. Judge Schrock then analyzed whether, had the prosecution had made a request to amend the criminal complaint, there was sufficient evidence presented at the hearing to support a criminal charge.

43. Judge Schrock considered the only other social media post that was presented at the hearing as being a purported true threat. He noted that the testimony established that the post had been made on October 30, 2022. Because the criminal complaint was not filed until November 10, 2023, Judge Schrock held that

it was outside of the one-year statute of limitations for a simple misdemeanor and could not support the criminal complaint.

44. Because the criminal complaint filed by Mallory was insufficient and the only other post offered by the prosecution was beyond the statute of limitations, Judge Schrock held it was not necessary for him to analyze the constitutional issues presented by the motion to dismiss.

45. Judge Schrock therefore granted the motion to dismiss, cancelled the no-contact order, and assessed court costs to the State of Iowa.

46. Had Judge Schrock conducted the constitutional analysis of the other social media post offered by the prosecution, he would have found it did not constitute a "true threat" under the Supreme Court's jurisprudence. A copy of this post is attached as Exhibit C to this complaint.

47. Statements of "political hyperbole" are not a "true threat." *Watts* v. *U.S.*, 394 U.S. 705, 708 (1969) (per curiam) (reversing conviction of antiwar protestor who said he would not report under his draft notice and "[i]f they ever make me carry a rifle the first man I want to get in my sights is L.B.J.")

48. The objective inquiry demanded by a "true threat" analysis is exacting. It requires the fact finder to "look at the entire factual context of the statements including: the surrounding events, the listeners' reaction, and whether the words are conditional." *U.S.* v. *Bagdasarian*, 652 F.3d 1113, 1119 (9th Cir. 2011) (cleaned up). The Court "must not distort or embellish [the words'] plain meaning so that the law may reach them." *Id.* (finding statements "Obama fk the niggar" and prediction that President-elect Obama "will have a 50 cal in the head soon" to not constitute a true

threat.) "Here, the meaning of the words is absolutely plain. They do not constitute a threat…) *Id*.

49. As held by the United States Supreme Court before Mallory filed his criminal complaint, the First Amendment demands "a subjective mental-state requirement shielding some true threats from liability. The reason relates to what is often called a chilling effect." *Counterman*, 600 U.S. at 75.

50. *Counterman* holds that when speech is directed to government officials (as it was here) the law required "specific intent, presumably equivalent to purpose or knowledge" as a mental state. *Id.* "[I]ncitement to disorder is commonly a hair's-breadth away from political 'advocacy'—and particularly from strong protests against the government and prevailing social order." *Id.* at 81. "A strong intent requirement was…one way…to ensure that efforts to prosecute incitement would not bleed over, either directly or through a chilling effect, to dissenting political speech at the First Amendment's core." *Id.*

**51.** Mallory's criminal charge made no effort to show the required mental state. Despite the recent warning of the Supreme Court of the constitutional interests at stake, he proceeded to charge Lee simply because she disobeyed him.

**Count I –Violation of Rights Protected under the First and Fourteenth Amendments to the U.S. Constitution**

52. The Civil Rights Act of 1871, later codified at 42 U.S.C. § 1983, and as interpreted by the U.S. Supreme Court, provides that persons acting under color of state law "shall be liable to the party injured in an action at law, suit in equity, or

other proper proceedings" for the "deprivation of any rights, privileges, or immunities secured by the Constitution."

53. The Fourteenth Amendment to the Constitution incorporates the rights under the First Amendment to engage in speech and to petition the government for redress of grievances. "The framers designed the Free Speech Clause of the First Amendment to protect the freedom to think as you will and to speak as you think." *303 Creative LLC*, 600 U.S. at 584.

54. An individual has the right to be free from retaliation for her exercise of her First Amendment rights of speech and petition of the government. *Garcia* v. *City of Trenton*, 348 F.3d 726, 728-29 (8th Cir.). "[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions for speaking out." *Hartman* v. *Moore*, 547 U.S. 250, 256 (2006) (citations omitted). "If there is any fixed star in our constitutional constellation it is the principle that the government may not interfere with an uninhibited marketplace of ideas." *303 Creative LLC*, 600 U.S. at 585 (cleaned up).

55. Retaliation for engaging in protected speech is actionable when it will chill a person of ordinary firmness in the plaintiff's position from engaging in future First Amendment activity or when it otherwise adversely affects the plaintiff's protected speech. *Houston Comm. Coll. Sys.* v. *Wilson*, 595 U.S. 468, 477-78 (2022).

56. Mallory's retaliatory actions caused injury to Lee including, but not limited to, loss of standing in the community, pecuniary losses, and emotional injury.

57. Mallory's retaliatory actions were a direct result of Lee engaging in protected activities and were a substantial and motivating factor in Mallory's retaliatory actions. Mallory's retaliatory actions would chill a person of ordinary firmness from engaging in or from continuing to engage in speech and petition rights protected under the Constitution.

## Conclusion

58. As a result of Mallory's actions, the Court should award Lee compensatory and punitive damages, injunctive relief, court costs, attorney fees, and such other relief as allowed by law.

59. Plaintiff demands jury trial for this claim.

Respectfully submitted,

/s/ Alan R. Ostergren
**Alan R. Ostergren**
Alan R. Ostergren, PC
500 East Court, Suite 420
Des Moines, Iowa 50309
(515) 207-0134
alan.ostergren@ostergrenlaw.com
Attorney for Plaintiff